UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 16-cr-127 (DWF/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jared Daniel Jones, | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Jared Daniel Jones's ("Defendant") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 37], and upon Defendant's Motion to Suppress Statements, Admission, and Answers. [Docket No. 38]. The Court held a motions hearing on June 28, 2016, regarding the parties' pretrial motions.[1] The parties requested an opportunity to submit supplemental briefing which was completed and the motions to suppress than taken under advisement on July 18, 2016.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 37], be **DENIED**, and that Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 38], be **GRANTED in part** and **DENIED in part**.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 46].

## I.    BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant is charged with one (1) count of murder in the first degree, in violation of 18 U.S.C. §§ 2, 1111(a), 1151, and 1153(a); one (1) count of murder in the second degree, in violation of 18 U.S.C. §§ 2, 1111(a), 1151, and 1153(a); and one (1) count of robbery, in violation of 18 U.S.C. §§ 2, 1151, 1153(a), and 2111. (Indictment [Docket No. 26]).

### B.  Facts

The record presently before the Court indicates that Defendant was arrested, on February 8, 2016, by Criminal Investigator Jeffrey Pierre ("CI Pierre"), pursuant to a Red Lake Tribal warrant in an unrelated case. (June 28, 2016, Motions Hearing, Digital Recording at 1:56–1:57 p.m.). CI Pierre had searched to see if Defendant had any tribal warrants after law enforcement began suspecting Defendant of the charges which are now the subject of the present Indictment. (Id.; Id. at 2:24–2:26 p.m.). As such, FBI Special Agent Christopher Dudley ("SA Dudley") was also present when Defendant was arrested pursuant to the Red Lake Tribal warrant. (Id. at 2:24–2:26 p.m.). Defendant was handcuffed, placed in a marked tribal police car, and transported to the Red Lake Detention Center. (Id. at 1:57–1:58 p.m.). SA Dudley testified that at the time of arrest, in front of the house where Defendant was arrested, Defendant was not free to leave because he was under arrest. (Id.).

SA Dudley and CI Pierre, ultimately, interviewed Defendant at the Red Lake Detention Center, regarding the charges which are now the subject of the present Indictment, on three separate occasions. (Id. at 1:47–1:48 p.m.). Those interviews occurred on February 8, 2016; on February 10, 2016; and on April 5, 2016.

On February 8, 2016, Defendant was interviewed by SA Dudley and CI Pierre in an interview room which was attached to the Red Lake Detention Center. (Id. at 1:47–1:48 p.m.). The entire interview was recorded. (Id. at 1:50 p.m.).[2] As noted above, Defendant was at the Red Lake jail because he had just been arrested on a Red Lake Tribal warrant; however, SA Dudley and CI Pierre were interviewing Defendant regarding the charges which are now the subject of the present Indictment. (Id. at 1:48–1:49 p.m.). SA Dudley had Defendant brought to the interview room from his cell, and only Defendant, SA Dudley, and CI Pierre were present during the interview. (Id. at 1:47–1:48 p.m.). The interview room in which the interview was conducted had two exits, a table, and three or four chairs. (Id.). SA Dudley and CI Pierre were attired in casual clothes, and SA Dudley was not armed. (Id.).

Prior to conducting the interview SA Dudley verbally apprised Defendant of his rights[3] and provided Defendant with a FBI FD-395 Advice of Rights form, which Defendant signed. (Id. at 1:49–1:50 p.m.).[4] The Advice of Rights Form contained the following substantive text:

**YOUR RIGHTS**
Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during the questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

---

[2] At the motions hearing the Government, without objection, offered the recording of the February 8, 2016, interview into evidence as Government's Exhibit 1. (June 28, 2016, Motions Hearing, Digital Recording at 1:50–1:51 p.m.).

[3] While SA Dudley testified at the motions hearing that he could not recall whether or not he verbally advised Defendant of his rights, the recording of that interview clearly demonstrates that SA Dudley verbally apprised Defendant of each right listed on the Advice of Rights form. (Gov't's Ex. 1 at 1:30–1:57).

[4] At the motions hearing the Government, without objection, offered this Advice of Rights form into evidence as Government's Exhibit 2. (June 28, 2016, Motions Hearing, Digital Recording at 1:50–1:51 p.m.).

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(Gov't's Ex. 2).

At the motions hearing, SA Dudley testified that he gave Defendant the Advice of Rights form, and then Defendant signed the form which CI Pierre and SA Dudley signed as witnesses. (June 28, 2016, Motions Hearing, Digital Recording at 1:49–1:50 p.m.). SA Dudley also testified that he did not ask Defendant if understood the rights, did not ask Defendant if he could read, did not ask Defendant if he had graduated from high school, did not ask Defendant if he read the Advice of Rights form, and did not ask Defendant is he was intoxicated at that point. (Id. at 1:59–2:03 p.m.).  SA Dudley, however, also testified that he watched Defendant review the Advice of Rights form, and as noted above, SA Dudley also verbally apprised Defendant of the rights listed under "YOUR RIGHTS" on the Advice of Rights form. (Id. at 2:09–2:10 p.m.; Gov't's Ex. 1 at 1:30–1:57).

SA Dudley testified that Defendant seemed "fine," and awake and alert at the time of the interview. (June 28, 2016, Motions Hearing, Digital Recording at 1:50–1:52 p.m.). SA Dudley also testified that at the time of the interview Defendant did not appear to be under the influence of drugs or alcohol, did not indicate that he did not understand his rights, did not state that he couldn't read, did not appear confused, and did not state that he had not graduated high school. (Id. at 2:18–2:20 p.m.). CI Pierre testified that at the interview Defendant appeared fine physically and mentally and did not appear to be under the influence of drugs or alcohol. (Id. at 2:20–2:22 p.m.).

No threats were made to Defendant during the interview, and at no time did the officers raise their voices to Defendant. (See Gov't's Ex. 1). Defendant did not ask to leave the room at

any time during the interview. (See Id.). Defendant's demeanor during the course of the interview and the encounter in general was decent, responsive, and cooperative. (Id.).

The February 8, 2016, interview began with CI Pierre introducing himself and SA Dudley to Defendant and asking Defendant if it would be "alright" for CI Pierre and SA Dudley to talk with Defendant. (Id. at 00:00–00:16). Defendant acknowledged that it was ok to talk with him. (Id. at 00:16–00:18). After receiving some preliminary identification information, SA Dudley informed Defendant that the officers wanted to talk with Defendant about events which happened a "couple weeks" before the interview, and that the officers were not there to talk with Defendant about the tribal warrant on which he was arrest. (Id. at 1:00–1:35). SA Dudley then verbally read Defendant a Miranda warning. (Id. at 1:35–1:54). SA Dudley also informed Defendant that he was speaking with the officers voluntarily, and SA Dudley again informed Defendant that he could stop speaking with the law enforcement officers at any time. (Id. at 1:54–2:02). After verbally advising Defendant of his rights, SA Dudley gave Defendant the Advice of Rights form and asked Defendant to look at the Advice of Rights form to make sure SA Dudley had not "missed anything." (Id. at 2:02–2:13). Defendant and the officers sat in silence for approximately twenty-two second, presumable giving Defendant a moment to review the document. (Id. at 2:13–2:35). After Defendant signed the Advice of Rights form, SA Dudley began questioning Defendant regarding the incidents which gave rise to the charges which are now the subject of the present Indictment, including asking Defendant about his whereabouts at certain times and his social media activity; presenting Defendant with evidence in the present case; and the events of the night at issue. (Id. at 2:13–37:00). SA Dudley told Defendant that this was the time for Defendant to tell his side of the story to law enforcement. (Id. at 18:01–19:00). SA Dudley also asked Defendant if he had any questions for the officers to which Defendant

responded he had no questions. (Id. at 31:00). Approximately thirty-three (33) minutes into the interview, SA Dudley thanked Defendant for talking with law enforcement, told him that the officers would probably want to talk with him again, told him that if they did return to talk with Defendant, then Defendant, just like this interview, would be not required to talk with law enforcement, if he did not want to talk with them. (Id. at 32:47–33:30).

Approximately thirty-seven (37) minutes into the interview, SA Dudley asked if Defendant would be willing to voluntarily give a DNA sample. (Id. at 37:30–38:00). Defendant did not vocalize his consent, but he did sign the Receipt form, (Gov't's Ex. 3), which the officers presented to him, and he began asking questions about when he would be having a court hearing. (Gov't's Ex. 1 at 38:00–38:21). Defendant also continued to ask questions regarding other matters while SA Dudley performed the DNA buccal swab. (Id. at 38:21–41:00).

Approximately forty (40) minutes into the interview, CI Pierre reminded Defendant that he was in custody for his tribal warrant and not for anything related to the questions the officers had been asking Defendant. (Id. at 39:58–43:30). SA Dudley concluded the interview by asking Defendant if he had any questions and if there was anything else he wanted to tell the officers. (Id. at 44:29–44:50). Defendant responded that there was not, and that "usually, um, Carol, and Justine, and um, and my dad are the ones that [inaudible] hangout so, you can ask them anything, just ask them, I need them to tell me what to do, can't do anything on my own." (Id. at 44:50–45:25).

At the conclusion of the February 8, 2016, interview SA Dudley took a DNA sample from Defendant via a DNA buccal swab.[5] Defendant was not arrested—on the charges which are

---

[5] While SA Dudley initially testified that the sample was taken at the February 10, 2016, interview, the Receipt for Property which he completed at the time of the buccal swap indicates that the buccal swab was conducted on February 8, 2016. The Government offered, without objection, this Receipt for Property form into evidence as Government's Exhibit 3. SA Dudley also later testified that the buccal swab was conducted on February 8, 2016.

now the subject of the present Indictment—at the conclusion of the February 8, 2016, interview. (See Id.).

SA Dudley then concluded the interview and the recording. (Id. at 45:25–45:32).

Defendant was interviewed a second time on February 10, 2016, two days after his first interview, in the same interview room at the Red Lake jail as the first interview. (June 28, 2016, Motions Hearing, Digital Recording at 1:50–1:52 p.m.). SA Dudley had Defendant brought from his cell to the interview room. (Id. at 2:05–2:07 p.m.). SA Dudley and CI Pierre were the only law enforcement officers present at the interview. (Id. at 2:06–2:07 p.m.).

SA Dudley testified that Defendant appeared "fine," awake, alert, and coherent at the time of the second interview. (Id. at 1:50–1:52 p.m.). SA Dudley also testified that, at the time of the interview, Defendant did not appear to be under the influence of drugs or alcohol, did not indicate that he did not understand his rights, did not state that he couldn't read, and did not state that he had not graduated high school. (Id. at 2:18–2:20 p.m.) CI Pierre testified that at the second interview Defendant seemed "fine," coherent, and not under the influence of drugs or alcohol. (Id. at 2:23–2:24 p.m.). SA Dudley testified that the entire second interview was recorded. (Id. at 1:53 p.m.).[6]

Defendant did not ask to leave the room at any time during the second interview. (See Gov't's Ex. 4). Defendant's general demeanor during the course of the second interview was decent, responsive, and cooperative. (Id.) No threats were made to Defendant during the interview. (Id.).

---

(June 28, 2016, Motions Hearing, Digital Recording at 2:02–2:04 p.m.). Moreover, the taking of the DNA buccal swab can be heard on the recording of the February 8, 2016, interview. (Gov't's Ex. 1).

[6] At the motions hearing the Government, without objection, offered the recording of the February 10, 2016, interview into evidence as Government's Exhibit 4. (June 28, 2016, Motions Hearing, Digital Recording at 1:53–1:54 p.m.).

Shortly after the second interview began, SA Dudley told Defendant that the officers wanted to go back over the information they had, and SA Dudley asked if Defendant would be willing to talk with the officers again. (Id. at 00:06–00:18). Defendant responded that he had already told the officers everything he knew to which SA Dudley replied the officers just wanted to go through it again if that was alright with Defendant. (Id. at 00:18–00:42). SA Dudley then told Defendant that "there's paperwork for everything that I do because it is the FBI. It's about all we do is paperwork so, uh, I know you already signed one of these waiver sheets again the other day but every time we talk, it just, I gotta do it again ok." (Id. at 00:45–1:01). Immediately following that exchange, SA Dudley asked for the time, Defendant joked with the officers about the time, and SA Dudley asked Defendant to read over the Advice of Rights form and informed him that it was the same form as the previous interview two days earlier. (Id. at 1:18–1:54). The recording is silent for approximately six seconds after which Defendant signed the Advice of Waiver form. (Gov't's Ex. 4). Neither SA Dudley nor CI Pierre read Defendant a Miranda warning aloud. (Id.). After the execution of the Advice of Rights form, SA Dudley began questioning Defendant about the incidents which gave rise to the charges that are now the subject of the present Indictment. (Id. at 2:01–58:16).

Approximately five minutes into the second interview, the following exchange took place:

| | |
|---|---|
| SA Dudley: | So he picked you up in the neighborhood, up there, and then you guys are leaving and you realize he is drunk and you don't want to be in the car while he is driving so you swap out by the transfer station. |
| Defendant: | Transfer station? |
| CI Pierre: | Talking about the dumps. |
| SA Dudley: | The dumps |
| Defendant: | See, I'm not gonna wanna talk anymore if you guys are going to switch up the story or whatever. |
| CI Pierre: | The transfer station and the dumps are pretty much kind of like the same thing. [inaudible] call it the transfer station but it's also called the dump. |

|  | We are not trying to confuse you or anything we are just trying to make sure that it's, what you said, but like the transfer station would be the same thing. |
|---|---|
| SA Dudley: | We are not trying to, ok, um, so, from there just kind of walk us through, through again if you will. |
| Defendant: | I [inaudible] telling you my side of the story, alright, if you got it down on a piece of paper. |
| SA Dudley: | Ok. |
| Defendant: | My story aint gonna change, nothing, it's what happened that night. |
| SA Dudley: | Ok, I'm not trying to get you to change your story or anything like that, ok, I'm just trying to fil in other details, you know whenever, something, we are doing something we remember certain things, some things we don't, but there's always, you know, what you told us is less detail than it would be if someone was following you around with a movie camera the whole time. You know. We would get more detail because of that, and I am not saying that it was because you were leaving stuff out, what I am saying is we are just trying to get as much detail about what happened that night as we can, ok. And here's the deal Jared, I was straight with you the other day, Jeff was straight with you, and I am going to continue to be straight with you, ok, the more detail you can provide right now, it's going to help you out, because here's the reality, ok, Ron died, ok, you left him, you left him back there, ok, and I know you got your reasons for why you did, and we're not saying we disagree with why you did it, but what I am saying is that you left him back there, he wasn't very well dressed, ok, and he died, alright, and he died of exposure. But you stole his car in doing that, you taking off in his car is considered stealing his car, and he died of exposure, and what I am telling you is that, the way that that's looked at, ok, by the system |
| Defendant: | What do you mean he wasn't very well dressed? |
| SA Dudley: | He wasn't, he wasn't wearing, he wasn't wearing appropriate clothing to be out in near sub-zero temperatures for a long time and drunk. Alright. So I am telling you, you left a guy who was highly intoxicated out in a back, you know a back road [inaudible] near sub-zero temperatures in the dark, alright, and, and, and, he died. The reality is that it is viewed as a carjacking and somebody died in the course of that carjacking, that a big deal, and so what we saying is, we're talking about it, you laid out your story about what happened, ok, and it's understandable. From what you're saying, what this guy was doing was try to come on to you and you wanted to ditch him. If that is what happened, we need more detail, we need to be able to show that you are being completely upfront about every bit of what happened that night because the reality is, is that a judge and a jury looking at this, here's what they're seeing, they're seeing, they're seeing a guy who died 'cause he was left, left out back there, you stole his car, ok, his phone was gone, his wallet was gone, alright, they're gonna say you stole those. And again I am being upfront with you, autopsy already been done, ok, he had a little bit of trauma as well, alright, he'd |

been hit, punched, not beaten to a pulp or nothing like that, ok, but he'd been hit a few times, ok, pretty hard, and you might have a reason for why that happened, again, if that's the case we want to get those details to get your full side of it, but what I am saying is that a judge and a jury is gonna see a dead guy who's left after he got his car stolen, his wallet and phone, he clearly had some trauma from where he was punched, his glasses are there broken on the scene, we got a few drops of blood next to his body, there's a knife on the ground next to his body, next to all this stuff that was dumped out of his pocket, and some of his personal belongings. Ok. Those are the facts, alright, that's not us making stuff up, alright, that's the reality of it, and the only way that you are going to be able to show a different side of what happened, or have a better outcome of that is if you can show some mitigating factors as to what happened and why. Ok. You are telling us it wasn't a straight carjacking. You didn't find this guy, jack him for his car, just cause you wanted a ride. You're telling us you had no intention for this guy to die, you thought you were just getting a ride.

(Id. at 5:08–10:53). SA Dudley began showing Defendant pictures of the evidence found at the scene of the crime, including prints and DNA evidence. (Id. at 10:53–12:39). Defendant then asked if law enforcement had found any of his DNA on any of the evidence. (Id. at 12:40–12:46). SA Dudley responded that they did not want to "jump to that, to all that stuff yet," but instead, SA Dudley wanted to talk about the details about what happened. (Id. at 12:46–13:12).

Defendant then began answering the question, asking some of his own questions, and answering further questions asked of him. (Id. at 13:13–58:16). Approximately, fifty-six minutes into the interview, Defendant asked SA Dudley if any of the answers he was providing the officers were helping Defendant, to which SA Dudley replied "Yeah, dude, it is. Trust me, it is. It's helping you a lot." (Id. at 56:03–57:00). The officers concluded the interview by telling Defendant to contact them if he remembered anything else that he thought was important, and they also told him that they could not tell him what was going to happen with the present case. (Id. at 58:16–1:04:27).

Defendant was interviewed for a third time, on April 5, 2016, at the Red Lake jail, contemporaneously to Defendant's arrest on the charges which are now the subject of the present

Indictment. (June 28, 2016, Motions Hearing, Digital Recording at 1:53–1:54 p.m.). The interview took place in the same interview room as the two previous interviews. (Id.). CI Pierre testified that, at the third interview, Defendant seemed "fine," coherent, and not under the influence of drugs or alcohol. (Id. at 2:23–2:24 p.m.). SA Dudley also testified that, at the time of the third interview, Defendant did not appear to be under the influence of drugs or alcohol, did not indicate that he did not understand his rights, did not state that he couldn't read, did not appear confused, and did not state that he had not graduated high school. (Id. at 2:18–2:20 p.m.).

SA Dudley had Defendant brought from his cell to the interview room. (Id. at 2:10 p.m.). No threats were made to Defendant during the interview. (Gov't's Ex. 6). Defendant's demeanor during the entire course of the interview was generally non-responsive and defensive. (Id.).

At the inception of the third interview, SA Dudley served Defendant with a Federal Arrest Warrant, informed Defendant that he was being placed under arrest, and explained the charges for which Defendant was being arrested. (Id. at 00:30–1:27). Immediately following that, SA Dudley read Defendant a Miranda warning, and SA Dudley informed Defendant that after he heard the Miranda warning he could then decide whether or not he wanted to talk with the officers. (Id. at 1:28–2:41). SA Dudley testified that he provided Defendant the Advice of Rights form, but Defendant would not sign the Advice of Rights form as SA Dudley annotated on the bottom of the Advice of Rights form. (June 28, 2016, Motions Hearing, Digital Recording at 1:54–1:55 p.m.).[7] The entirety of the third interview was also recorded. (Id. at 1:54–1:56 p.m.).[8]

---

[7] At the motions hearing the Government, without objection, offered this Advice of Rights form into evidence as Government's Exhibit 7. (June 28, 2016, Motions Hearing, Digital Recording at 1:53–1:55 p.m.).

[8] At the motions hearing the Government, without objection, offered the recording of the April 5, 2016, interview into evidence as Government's Exhibit 6. (June 28, 2016, Motions Hearing, Digital Recording at 1:53–1:55 p.m.).

When SA Dudley then gave the Advice of Rights Form to Defendant, the following

exchange took place:

| | |
|---|---|
| Defendant: | I thought you said I could like get on self-defense though. |
| SA Dudley: | What's that know now? |
| Defendant: | I thought you said I had a case of self-defense though. |
| SA Dudley: | You're saying it's self-defense? |
| Defendant: | Yeah. |
| SA Dudley: | Ok, well then I want, I want to hear about it then. I mean that's, did he attack you? |
| Defendant: | [inaudible]. I want to go back to my cell. |

(Id. at 2:49–3:19) (emphasis added). Following Defendant's request to go back to his cell,

Defendant and the officers sat in silence for almost a minute. (Id. at 3:19–4:00). The silence was

broken by SA Dudley stating the following:

SA Dudley:    I mean, I guess the question you have to ask yourself, is I mean, is, is Derrick gonna have the same story, you know that, that you have. Alright, that's the reality right now, I don't know how close you guys are, I don't know how good of buddies you guys are, from what each of you've told me, you don't know each other really well, but again this is your opportunity to talk with us and get your side, you know get your side of the story out there. I know we talked initially, you know I understand, I understand, from your perspective why you did what you did, ok, we talked about that last time, you told us what was going on in the car leading up to it, but, um, if there is more to it, if there's more detail, um, this is your chance to discuss that, or if there was anyone there with you and Derrick, this is kinda your one chance to, you know, to, to let us know if there was any one else involved. [Pause]. So if you don't want to talk, we'll certainly send you back to your cell, but this is a good opportunity for you to talk with us.

(Id. at 4:00–5:11). Following SA Dudley's statement, the parties again sat in silence for

approximately 30 seconds. (Id. at 5:11–5:40). That silence was also broken by SA Dudley, who

stated that "I know I just, hit you with a lot, that's a lot to think about right now. So, we can sit

here and give you a few minutes, but the choice is yours." (Id. at 5:40–5:48). Following that

statement, the parties once more sat in silence for almost another minute. (Id. at 5:48–6:32). This

silence was likewise broken by SA Dudley with the following statement:

SA Dudley:   When we talk to Derrick next, or, is he gonna tell us anything different than you did? Cause I already talked to him about a month and a half ago. I did a search warrant at his house. Did a pretty detailed interview with him and he talked to us quite a bit. And he says he was just along for the ride. And he said you dropped him off back at his house after you guys left Ron out there. [Pause]. I mean, he basically said he never touched the guy, says he had nothing to do with leaving him out there, and he was just afraid you were going to leave him there too, and that's why he jumped in the car with you when you took off. [Pause]. And now that he's just been arrested on felony murder charges, I am gonna talk to him right after we get done with you and I can guarantee is going to talk to us a lot more then.

(Id. at 6:33–7:39).

Defendant was silent for nearly four and a half minutes—after originally telling SA Dudley that he wanted to go back to his cell—while SA Dudley continued his efforts to question Defendant. (Id. at 3:19–7:44).

Only after that four-and-a-half-minute silence did Defendant then began responding to SA Dudley's persistent questions by telling SA Dudley that his story was not going to change. (Id. at 7:46–10:04). Defendant, however, quickly again became non-responsive to SA Dudley and began asking SA Dudley about self-defense and what he was being charged with. (Id. at 10:04–12:50). Defendant then answered the officers' continuing questions regarding whether or not anyone beside Defendant and Derrick were involved in the incident, about whether Defendant remembered anything else about the night at issue, and about why Derrick's story was inconsistent with Defendant's story. (Id. at 12:50–18:45).

Approximately nineteen minutes into the interview the following exchange took place:

Defendant:   Man, I [inaudible] wanna [inaudible]. I want to speak to my lawyer first.
SA Dudley:   Ok,

[5 second pause]

SA Dudley:   Alright we'll

13

| | |
|---|---|
| Defendant: | [inaudible] Are we both getting charged with the same thing though? |
| SA Dudley: | Yep. |
| Defendant: | How much [inaudible] thought you said [inaudible] self defense. |

(Id. at 18:46–19:19) (emphasis added). SA Dudley then told Defendant that self-defense was for a jury to decide, and then SA Dudley began telling Defendant that SA Dudley wanted to talk with Defendant about the "McNeil stabbing." (Id. at 19:19–21:21). Defendant told SA Dudley that he did not know what SA Dudley was talking about, and Defendant again told SA Dudley that he wanted to go back to his cell. (Id. at 21:21–21:25). However, SA Dudley continued to talk to Defendant about the present case and the "McNeil stabbing," and Defendant again told SA Dudley that he did not know what he was talking about, and that he wanted to go back to his cell. (Id. at 21:25–22:05). SA Dudley then concluded the interview.

In the three minutes of interview which follow Defendant's statement that he wanted to speak to his lawyer, SA Dudley never clarified if Defendant still wanted to speak to his lawyer or whether he wanted to continue talking with law enforcement without his lawyer.

## II.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS. [DOCKET NO. 38].

Defendant moves the Court for an order suppressing statements he made on February 8, 2016; on February 10, 2016; and on April 5, 2016. (See Def.'s Mot. to Suppress Statements, Admissions, and Answers [Docket No. 38]).

In support of his motion to suppress the statements he made on February 8, 2016; on February 10, 2016; and on April 5, 2016, Defendant contends that the officers were required to provide him with a Miranda warning before interrogating him, and that he did not "give a valid waiver" of his rights prior to any of the three interviews. (See Def.'s Mem. in Support of his Mot. to Suppress Statements [Docket No. 50]). Therefore, Defendant argues, the statements he

made on February 8, 2016; on February 10, 2016; and on April 5, 2016, should be suppressed.
(Id.).

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B.  Analysis

The statements that Defendant seeks to suppress are categorized into three groups: (1) the statements Defendant made on February 8, 2016, during the interview at Red Lake Detention Center following Defendant's arrest in an unrelated matter; (2) the statements made on February 10, 2016, during the second interview at the Red Lake Detention Center; and (3) the statements

Defendant made on April 5, 2016, at the Red Lake Detention Center contemporaneously to his arrest on the charges which are now the subject of the present Indictment.

### 1. February 8, 2016, Statements

Defendant firsts asks the Court to suppress the statements he made to SA Dudley and CI Pierre, on February 8, 2016. As noted above, Defendant contends that at the February 8, 2016, interview the officers were required to provide him with a <u>Miranda</u> warning before interrogating him, and that he did not "give a valid waiver" of his rights at that interview. (<u>See</u> Def.'s Mem. in Support of his Mot. to Suppress Statements [Docket No. 50]).

<u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444). To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that law enforcement's express questioning of Defendant on February 8, 2016, constituted interrogation. It is also undisputed that the Defendant was in custody during the February 8, 2016, interview when he made the first of the statements he now seeks to suppress. (<u>See</u> Gov't's Response to Def.'s Mot. to Suppress Statements, [Docket No. 53], at 3) ("There is no doubt that the defendant was in custody and was questioned."). The record also clearly demonstrates that Defendant was read a <u>Miranda</u> warning before the interview began.[9]

---

[9] While Defendant does present some arguments that the <u>Miranda</u> warning at the February 8, 2016, interview was insufficient due to SA Dudley not knowing whether or not Defendant could read, the recording of that interview clearly demonstrated that SA Dudley read aloud the <u>Miranda</u> warning printed on the form under the "YOUR RIGHTS" heading before giving the form to Defendant to review and sign. (Gov't's Ex. 1 at 1:30–1:57).

Accordingly, the only issue before the Court regarding Defendant's February 8, 2016, interview is whether Defendant's waiver of his rights was made intelligently, knowingly, and voluntarily.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's wavier of his rights was made intelligently, knowingly, and voluntarily. <u>Miranda</u>, 384 U.S. at 444, 475. The validity of a <u>Miranda</u> waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "The government has the burden of proving the validity of the <u>Miranda</u> waiver by a preponderance of the evidence." <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004).

<u>1. Voluntariness</u>

Courts assess whether a waiver of rights pursuant to <u>Miranda</u> was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." <u>United States v. Contreras</u>, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was <u>involuntary</u> and not as bearing on the separate question whether the waiver was knowing and intelligent." <u>United States v. Turner</u>, 157 F.3d

552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant does not point to any particular factor which renders his February 8, 2016, rights waiver pursuant to Miranda involuntary. Defendant offers no specific argument in his motion papers that the officers engaged in any specific coercive tactics that caused his will to be overborne during the interview. In fact, the Court's independent review of the audio recording of the February 8, 2016, interview indicates that the officers did not engage in threatening or coercive tactics. See United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Throughout the interview, SA Dudley and CI Pierre maintained a conversational tone and made no threats or promises to Defendant. Further, the

18

Court's review of the recording of the interview shows that Defendant spoke willingly and non-defensively with the officers. The interview, which lasted only forty-five minutes, was also not coercive in its duration. See Id. (noting that interrogation lasting more than two hours was not coercive in duration).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights on February 8, 2016, was voluntary.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the February 8, 2016, interview consists of the audio recording of the interview, the testimony of CI Pierre, and the testimony of SA Dudley.

Defendant argues that his waiver was not knowing and intelligent because SA Dudley did not ask if Defendant was literate, if he had actually read the Advice of Rights form provided, if he graduated high school, if he understood his rights, or if he had any questions about his rights. (Def. Mem. in Support of His Mot. to Suppress Statements, [Docket No. 50], at 10). Notably, Defendant does not assert that he in fact cannot read or write. (Id.). Defendant only argues that SA Dudley failed to ask him whether or not he could read or write. (Id.). Defendant also argues that it is unclear as to why he signed the Advice of Rights form because SA Dudley did not tell Defendant to sign it if he waived his rights, but instead told him to take a look at the form to see if SA Dudley missed anything. (Id. at 11). Defendant relies on Tague v. Louisiana, 444 U.S. 469 (1980), in support of his argument that SA Dudley was required to ask Defendant if he

understood his rights, if he was literate, and if he was otherwise capable of understanding his rights. However, Defendant's reliance on Tague is inapposite.

In Tague, the arresting officer, in addition to not remembering if he asked defendant if he understood his rights, could not even remember what rights he read to defendant. Id. at 469. The United States Supreme Court in Tague specifically noted that "no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement." Id. at 471. The Court reiterated that a waiver of rights need not be explicit but may be inferred from the actions and words of a person interrogated. Id. Therefore, Tague does not stand for the proposition that law enforcement must always ask Defendant if he understood his rights, if he was literate, and if he was otherwise capable of understanding his rights; instead, it simply stands for the proposition that the Government has the burden of showing a defendant's waiver of rights pursuant to Miranda was knowing and intelligent, and that the wavier may be inferred from the actions and words of the person being interrogated. Id. (citing North Carolina v. Butler, 441 U.S. 369 (1979)).

In the present case, the Government offers ample evidence for the Court to determine that Defendant's waiver of his rights on February 8, 2016, was knowing and intelligent.

Considering the totality of the circumstances, the Court's independent review of the audio recording of the February 8, 2016, interview indicates that Defendant appeared to fully comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers. The audio recording, further, provides that SA Dudley read Defendant the Miranda warning, handed Defendant a written copy of the Miranda warning to review, allowed Defendant time to review the written Miranda warning, and reiterated to Defendant that the interview was voluntary. In fact, without being told to do so, the

Defendant signed the written Advice of Rights form before SA Dudley began interviewing Defendant. The signing of such a form "carries a significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing Butler, 441 U.S. at 373). The weight to be given to Defendant signing this Advice of Rights form is bolstered by the fact that SA Dudley read the rights on the form under the "YOUR RIGHTS" heading to Defendant before handing him the form.

Furthermore, at the motions hearing SA Dudley and CI Pierre offered unrebutted testimony that Defendant, at the time of the interview, appeared fine, alert, and not under the influence of any intoxicants. SA Dudley further testified that he observed Defendant looking at the Advice of Rights form and appearing to read the form after SA Dudley gave it to Defendant.

Defendant's argument that the waiver is not knowing and intelligent because SA Dudley only told Defendant to look at the form to see if he missed anything, and did not explicitly tell Defendant to sign the form only if he waived his rights, is mitigated by the fact that SA Dudley did not tell Defendant to sign the form at all. SA Dudley read the form aloud, gave Defendant the form, and only told Defendant to review the form. Defendant unilaterally signed the form after he was observed to have reviewed it himself.

Therefore, under the totality of the circumstances—including the consideration of Defendant's own actions and words—the Court concludes that Defendant's waiver of his rights at the February 8, 2016, interview was knowing and intelligent.

Based on the foregoing, the court recommends **DENYING** Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 38], to the extent the motion pertains to the statements Defendant made during the February 8, 2016, interview.

### 2.   February 10, 2016, Statements

Defendant also asks the Court to suppress the entirety of the statements he made during a second interview with SA Dudley and CI Pierre on February 10, 2016; only two days after the first interview. Defendant contends that at the February 10, 2016, interview the officers were required to provide him with a <u>Miranda</u> warning before interrogating him, and that he did not "give a valid waiver" of his rights. (<u>See</u> Def.'s Mem. in Support of his Mot. to Suppress Statements [Docket No. 50]).

It is undisputed that SA Dudley's and CI Pierre's express questioning of Defendant on February 10, 2016, constituted interrogation. It is also undisputed that the Defendant was still in custody during the February 10, 2016, interview when he made the statements he now seeks to suppress. While SA Dudley did not read a <u>Miranda</u> warning aloud during the second interview, it is evident on the record that SA Dudley again provided Defendant with a written copy of the <u>Miranda</u> warning on the Advice of Rights form upon initiation of the second interview; which Defendant once again unilaterally signed under the "Waiver of Right" heading. (Gov't's Ex. 5).

Accordingly, the only issue before the Court regarding Defendant's February 10, 2016, interview is whether Defendant's second waiver of his rights was again made intelligently, knowingly, and voluntarily.

1. Voluntariness

Here too, Defendant does not point to any particular coercive police contact which renders his rights waiver pursuant to <u>Miranda</u> involuntary. Defendant offers no specific argument in his motion papers that the officers engaged in any specific coercive tactics that caused his will to be overborne during the interview.

The Court's independent review of the audio recording of the second interview on February 10, 2016, indicates that the officers did not engage in any threatening or coercive tactics. See Mims, 567 F. Supp. 2d at 1080 (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Throughout the second interview, SA Dudley maintained a reasonable tone and made no threats or promises to Defendant. Further, the Court's review of the recording shows that Defendant spoke willingly and cooperatively with SA Dudley. The interview, which lasted only an hour and four minutes, was also not coercive in its duration. See Id. (noting that interrogation lasting more than two hours was not coercive in duration).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights on February 10, 2016, was also voluntary.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his Miranda rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the second interview on February 10, 2016, again consists of the audio recording of the interview, the testimony of CI Pierre, and the testimony of SA Dudley.

Regarding the second interview, Defendant repeats his argument that his waiver was not knowing and intelligent because SA Dudley did not ask if Defendant was literate, if he had actually read the Advice of Rights form provided, if he graduated high school, if he understood his rights, or if he had any questions about his rights. (Def. Mem. in Support of His Mot. to

Suppress Statements, [Docket No. 50], at 12).[10] Defendant again does not assert that he in fact cannot read or write. (Id.). He only argues that SA Dudley failed to specifically <u>ask</u> him whether or not he could read or write. (Id.). Defendant asserts that his argument is bolstered here regarding the second interview because, at the conclusion of the first interview, Defendant had told SA Dudley that the Defendant needed family members to tell him what to do and that he couldn't do anything on his own. (Id.). As discussed above, however, this argument that SA Dudley was necessarily required to ask these questions and receive answers is unavailing. <u>See</u> <u>Butler</u>, 441 U.S. 369 (holding that a waiver of rights pursuant to <u>Miranda</u> need not be explicit but may be inferred from the actions and words of a person being interrogated). Defendant's assertion that he relied on family members to help him do certain undisclosed things does not rise to the level of informing SA Dudley that Defendant was per se unable to comprehend what was happening. That determination still relies on the totality of the circumstances including Defendant's actions. <u>See</u> <u>Id.</u>

Defendant also argues that SA Dudley mislead Defendant when he told Defendant that "there's paperwork for everything that I do because it is the FBI. It's about all we do is paperwork so, uh, I know you already signed one of these waiver sheets again the other day but every time we talk, it just, I gotta do it again ok." (<u>See</u> Def. Mem. in Support of His Mot. to Suppress Statements, [Docket No. 50], at 12–13).[11] Defendant argues that this comment made it seem like he was required to sign the form again, that it was just a matter of "FBI bookkeeping,"

---

[10] As previously noted, Defendant also presents an ancillary argument that courts may consider the education level of a defendant when determining whether a waiver was "knowing and voluntary," however, there is nothing in the record from which the Court could determine the Defendant's education level without engaging in speculation.

[11] In his moving papers, Defendant quotes the last six words of SA Dudley's statement as "we gotta do it again." (Def. Mem. in Support of His Mot. to Suppress Statements, [Docket No. 50], at 12). A careful review of the recording, however, shows that SA Dudley stated that "I just gotta do it again ok." (Gov't's Ex. 4 at 00:45–1:01).

and therefore, Defendant argues, Defendant's waiver of his rights could not be knowing and voluntary. (Id.).

In the present case, the Government offers ample evidence related to the second interview—including a recording of the interview, the testimony of SA Dudley, and the testimony of CI Pierre—for the Court to determine that Defendant's waiver of his rights on this second instance was also knowing and intelligent.

Considering the totality of the circumstances, the Court's independent review of the audio recording of the interview indicates that Defendant appeared to fully comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers. Defendant's understanding and comprehension of the situation was demonstrated when he corrected SA Dudley when Defendant felt SA Dudley was mischaracterizing what Defendant had previously said. (Gov't Ex. 4 at 5:08–10:53). The audio recording further provides that SA Dudley handed Defendant a written copy of the Advice of Rights form which set forth the Miranda warning to review, told Defendant it was the same as the previous written copy SA Dudley had given and read aloud to Defendant at the first interview only two days earlier, allowed Defendant additional time to again review the written warning, and asked Defendant if he was willing to talk with the officers. Only after Defendant signed the written Advice of Rights form containing the Miranda warning did SA Dudley begin interviewing Defendant. The signing of such a form "carries a significant weight in determining whether in determining whether his waiver was knowing and intelligent." Gallardo, 495 F.3d at 991 (citing Butler, 441 U.S. at 373). The weight of Defendant signing this second Advice of Rights form is buttressed by the fact that SA Dudley read the Miranda warning contained in the form aloud to Defendant at the previous interview just two days earlier, and he told Defendant at

the second interview that the Advice of Rights form was the same as the previous form; the content of which Defendant was already aware.

Furthermore, at the motions hearing SA Dudley and CI Pierre offered unrebutted testimony that Defendant, at the time of the second interview, appeared fine, alert, and not under the influence of any intoxicants. SA Dudley further testified that he observed Defendant looking at the Advice of Rights form, and appearing to also read the form on February 10, 2016, after SA Dudley gave the form to Defendant, and before Defendant signed the form.

Defendant's argument that his waiver of rights was not knowing and intelligent because SA Dudley misled Defendant when he told Defendant "we gotta do it again" (emphasis added) is hampered by the fact that the audio recording of the interview shows SA Dudley actual said "I gotta do it again." (emphasis added). Defendant's argument is likewise undercut by the fact that SA Dudley asked Defendant to read over the form, and Defendant appeared to take time to review the form before he signed it. See Butler, 441 U.S. 369 (holding that a waiver of rights pursuant to Miranda need not be explicit but may be inferred from the actions and words of a person interrogated). In addition, Defendant was told near the conclusion of the first interview just two days earlier by SA Dudley that if the officers returned to speak with Defendant again, he would still not be required to speak with the officers and it would again be Defendant's decision as to whether or not he wanted to speak with the officers. (See Gov't's Ex. 1 at 32:47–33:30).

Therefore, under the totality of the circumstances, including the consideration of Defendant's actions and words, the Court concludes that Defendant's waiver of his rights prior to the second interview on February 10, 2016, was knowing and intelligent.

The Court also notes that SA Dudley was not necessarily even required to read Defendant a new Miranda warning at the inception of the second interview. See United States v. Cajas–

Maldonado, 13 F. App'x 469 (8th Cir. 2001); see also United States v. Butler, 180 F.3d 967, 977 (8th Cir. 1999) (holding that a time interval alone between assertions of Miranda rights and subsequent waiver is not necessarily sufficient to render subsequent statements inadmissible).  In Cajas–Maldonado, the Eighth Circuit held that although the agent conducting a second interview of the defendant did not administer a new set of Miranda warnings, the circumstances surrounding the interview compelled the court to conclude that the defendant knowingly and intelligently waived his Miranda rights. Cajas–Maldonado, 13 F. App'x at 475. Specifically, the court found that the interviewing agent had advised the defendant that he still possessed his Miranda rights; there was no evidence that the defendant did not understand those rights; the record from the suppression hearing reflected that the defendant understood his rights at both interviews; there was no evidence of coercion; and there was no evidence of diminished capacity. Cajas–Maldonado, 13 F. App'x at 475. The court also noted that it, in light of the fact that the agent "advised" Defendant that he still had his Miranda rights, "the lack of evidence suggesting that Defendant did not understand his Miranda rights, the district court's finding that the Defendant was a 'relatively young man,' and the noncoercive nature of the April 24 and May 5, 2000, interview, the court could not conclude that the eleven-day interval between" defendant's Miranda warning and his second interview was "unreasonable." Cajas–Maldonado, 13 F. App'x at 475 n. 7.

In the present case, as in Cajas–Maldonado, the circumstances surrounding the second interview compel the Court to conclude that the defendant knowingly and intelligently waived his rights. As noted above, SA Dudley read Defendant a Miranda warning at the first interview; and after being given the opportunity to read the warning, the Defendant signed the waiver portion of the Advice of Rights form without being directed to do so. In the present case, there is

no evidence in the record to suggest Defendant did not understand the rights as present to him at the first interview. Prior to the second interview, just two days later, SA Dudley informed Defendant that the Advice of Rights form presented to Defendant at the second interview was the same as the form presented at the first interview where SA Dudley had read the form aloud to Defendant. Also similar to Cajas–Maldonado, there is no evidence in the present case of coercion or diminished capacity. Moreover, the interval between Defendant's first and second interview in the present case was only two days whereas the interval in Cajas–Maldonado found to be reasonable was eleven days.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 38], to the extent the motion pertains to the statements Defendant made during the second interview on February 10, 2016.

### 3.   April 5, 2016, Statements

Defendant also asks the Court to suppress the statements he made during the third interview with SA Dudley and CI Pierre on April 5, 2016, when Defendant was arrested pursuant to a federal arrest warrant based upon the charges which are now the subject of the present Indictment. (See Def.'s Mot. to Suppress Statements, Admission, and Answers [Docket No. 38]). In support of his motion to suppress the statements at his third interview, Defendant argues that he did not sign the Advice of Rights form, and that he was not given time to verbally respond before SA Dudley began interviewing Defendant, and therefore, he argues, he did not waive his rights. (Id. at 14–15).[12] The Government argues that although Defendant did not sign the waiver

---

[12] In support of his motion to suppress, Defendant also originally argued that his statements after he requested to speak to his lawyer should be suppressed as violating his right to counsel. See Edwards v. Arizona, 451 U.S. 477 (1981). However, the Government has now stipulated that it "would not seek to admit any statements made after Defendant requested to speak with a lawyer and spanning to the end of the recording." (Def. Mem. in Support of His Mot. to Suppress Statements [Docket No. 50], at 14 n. 1). (See also June 28, 2016, Motions Hearing, Digital Recording at 2:27–2:29 p.m.) (providing that the Government acknowledged that it did not intend to offer the "last part" of the April 5, 2016, interview in its case-in-chief).

form, his waiver of rights can be inferred from his actions and there was no evidence of police coercion, so the statements should not be suppressed. (See Gov't's Response to Def.'s Mot. to Suppress Statements, [Docket No. 53], at 4–6).

It is undisputed that the SA Dudley's express questioning of Defendant on April 5, 2016, constituted interrogation. It is further undisputed that Defendant was in custody for the purpose of Miranda at the time of the April 5, 2016, interview, as he was at that time under arrest by SA Dudley. It is also undisputed that SA Dudley gave Defendant a Miranda warning upon the initiation of the April 5, 2016, interview.

While both parties address the validity of Defendant's purported waiver of his rights, neither party addresses Defendant's statement at the very inception of the interview: "I want to go back to my cell[,]" and whether or not Defendant's statement that he wanted to return to his cell was an invocation of Defendant's right to remain silent.

As noted above, after SA Dudley read the Miranda warning at the start of the third interview, Defendant told SA Dudley that he wanted to go back to his cell. (Gov't's Ex. 6 at 2:41–3:19). The first question the Court must address, therefore, is whether Defendant invoked his right to remain silent by this statement.

During an interrogation, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wished to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473–74. "[A] person's 'right to cut off questioning'" is central to the Fifth Amendment, and this right must be "'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 103 (1975) (quoting Miranda, 384 U.S. at 474)). "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" United States v. Johnson, 53 F.3d 947, 955 (8th Cir. 1995) (quoting United States v.

Thompson, 866 F.2d 268, 272 (8th Cir. 1989)). A court considers "the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." Johnson, 53 F.3d at 955. "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of Miranda." United States v. Ferrer-Montoay, 483 F.3d 565, 569 (8th Cir. 2007).

After SA Dudley read the Miranda warning to Defendant, Defendant said "I want to go back to my cell." Further, for approximately the next four and half minutes Defendant sat in silence, and that silence was broken only by SA Dudley's persistent effort to attempt to illicit further responses from Defendant. (See Gov't's Ex. 7 at 3:19–7:44).

Defendant's statement that he wanted to go back to his cell is an unequivocally statement that he wanted to terminate the interview. Defendant's statement showed his unqualified desire for the interview to end. Defendant's statement did not imply that he would be willing to talk later. See in contrast United States v. Al-Muqsit, 191 F.3d 928, 936–37 (8th Cir. 1999) (finding that defendant did not invoke his right to remain silent by stating that he "wasn't ready to talk about" the crime at that time). Nothing about Defendant's statement indicated that he intended to clarify the statement. See United States v. Adams, 820 F.3d 317, 322–23 (8th Cir. 2016) (finding that a defendant statement of "Nah, I don't want to talk, man. I mean, I" signaled that he intended to clarify his statement and therefore the statement was equivocal). Defendant did not merely remain quiet or merely decline to speak. See Thompson, 866 F.2d at 272 (finding that merely declining to talk or declining to answer questions was not sufficient to invoke the right to remain silent).

On its face, Defendant's statement that he wanted to go back to his cell clearly and unequivocally indicated that he wanted the interview to end. There was nothing indirect,

ambiguous, or equivocal about Defendant's statement that he wanted the interview to end. See Ferrer-Montoay, 483 F.3d at 569. Instead, Defendant's statement unequivocally invoked his right to remain silent with sufficient clarity so that a reasonable officer would have understood Defendant to have exercised his right to remain silent. Defendant's invocation of his right to remain silent is bolstered by the fact that he continued to remain silent for over four minutes in resistance to SA Dudley's continued attempts to interrogate Defendant. Defendant was being detained on an unrelated tribal warrant and had just been told that he was under arrest pursuant to a federal arrest warrant, so he could not leave the room himself. Defendant's only recourse was to tell the officers that he wanted the interview to end. He did so by telling the officers that he wanted to return to his cell. Taken as a whole, Defendant's statement and actions, demonstrate that he clearly and unequivocally expressed his desire to invoke his right to remain silent and have the interview end.

After Defendant invoked his right to remain silent, SA Dudley should have "scrupulously honored" Defendant's invocation and ceased all further questioning. See Mosley, 423 U.S. at 102–04 (requiring law enforcement to "scrupulously honor" suspect's invocation of right to silence once accused indicates a desire to remain silent). However, SA Dudley disregarded Defendant's clear invocation and continued his efforts to obtain a statement from Defendant. It is clear that the officers did not "scrupulously honor" Defendant's invocation of his right to remain silent. As such, the entire statement following Defendant's invocation of his right, i.e. anything after Defendant stated that he wanted to return to his cell, ought to be suppressed.

Based on the foregoing, the court recommends **GRANTING** Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 38], to the extent the motion pertains to any statements Defendant made during the third interview on April 5, 2016.

III.   **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 37].**

Defendant also moves the Court for an order suppressing evidence of a DNA buccal swab obtained during the first interview with law enforcement on February 8, 2016. (Def.'s Mot. to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 37]).

Defendant's sole argument regarding suppression of the DNA buccal swab is that if the statements Defendant made on February 8, 2016, when the sample was taken, are suppressed, then the DNA buccal swab should be suppressed as well. (Def.'s Mem. in Support of His Mot. to Suppress Statements, [Docket No. 50], at 15; June 28, 2016, Motions Hearing, Digital Recording at 1:45–1:47p.m.).

The Court has, however, concluded that those statements at the February 8, 2016, interview should not be suppressed. As such, Defendant's argument that the DNA buccal swab should be suppressed because the statements at the February 8, 2016, interview should be suppressed is moot.

The Court's independent review of the audio recording of the February 8, 2016, interview indicates that SA Dudley informed Defendant that the buccal swab was voluntary. (Gov't's Ex. 1 at 37:30–41:00). The Court's further review of the recording indicates that after SA Dudley told Defendant the buccal swab was voluntary, and after Defendant signed the Advice of Rights form provided to him, Defendant conversationally continued asking the officers questions while SA Dudley collected the buccal swab. As noted above, Defendant does not specifically argue that he failed to consent to the DNA buccal swab (as a search under the Fourth Amendment) after being told it was a voluntary procedure.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 37].

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 37], be **DENIED**; and

2. Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 38], be **GRANTED in part** and **DENIED in part**.

Dated: July 28, 2016                                         s/Leo I. Brisbois
                                                             Leo I. Brisbois
                                                             U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.